UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ISABELLA MARTINEZ** <br> 2424 17th St. N.W. <br> Unit 102 <br> Washington, D.C. 20009 <br><br> *Plaintiff*, <br><br> v. <br><br> **NATIONAL RAILROAD PASSENGER CORPORATION** <br> **D/B/A AMTRAK** <br> 1 Massachusetts Avenue N.W. <br> Washington, D.C. 20001 <br><br> *Defendant.* <br><br> Serve: <br><br> **C T CORPORATION SYSTEM** <br> Registered Agent <br> 1015 15th St. N.W. <br> Suite #1000 <br> Washington, D.C. 20005 | Case No.: 21-2830 <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff, Isabella Martinez (hereinafter "Plaintiff" or "Ms. Martinez"), by and through her undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant, The National Railroad Passenger Corporation DBA Amtrak (hereinafter "Defendant" or "Amtrak") for race and national origin discrimination and in support thereof states as follows:

1

## INTRODUCTION

1. This action is authorized and instituted pursuant to the Civil Rights Act of 1866, Section 1981(a) ("Section 1981") for the Defendant's unlawful harassment and discrimination based on race (Hispanic) and national origin (Latin America) against the Plaintiff.

## JURISDICTION AND VENUE

2. This Honorable Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Section 1981 of the Civil Rights Act, to redress and enjoin contractual obligations of the Defendant.

3. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

4. Venue for this action is predicated upon 28 U.S.C. § 1391(b) and (c). Amtrak is headquartered within the District of Columbia and is thus deemed to reside within this judicial district, and subject to the court's personal jurisdiction with respect to this civil action. Accordingly, venue is proper in this Honorable Court pursuant to 28 U.S.C. § 1391(b) and (c).

## NATURE OF THE ACTION

5. Plaintiff brings this action to secure protection of rights granted under the statute mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

6. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, a violation of privacy, emotional tranquility, and denial of her constitutional and statutory rights.

7. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

**PARTIES**

8. Plaintiff Isabella Martinez is a Latina female who resides in Washington, D.C., where she currently works for KMPG.

9. Defendant is a private corporation, which is headquartered in the District of Columbia.

10. During the relevant period, the Plaintiff was traveling on one of Defendant's trains, the 2104 Acela Express, from DC to New York City in the business class section of the train, pursuant to two Acela tickets that she purchased for the date and time that she was in transit.

11. During the relevant period, Plaintiff was in a contractual relationship with Defendant within the meaning and entitled to the protections of Section 1981.

**FACTUAL ALLEGATIONS**

12. Plaintiff contends that the Agency discriminated against her based on her race (Hispanic) and national origin (Latin America).

13. On or about June 10, 2019, Plaintiff was aboard the Amtrak 2104 Acela express train in route from Washington, D.C. to New York City.

14. Plaintiff is a consultant at KPMG and is required to travel frequently to and from client sites from Monday through Thursday. As such, she is a regular passenger aboard Amtrak and almost always travels business class.

15. Plaintiff's employer has a partnership with Amtrak with which tickets may be bought at firm rates via American Express ("AMEX"). At the time of the incident, Plaintiff's business class ticket was purchased via AMEX per her firm's policy.

16. Plaintiff was travelling with her sister, Jacqueline Martinez, at the time of the incident. Both women were dressed casually for the journey, with Plaintiff keeping her professional attire in her backpack so that she could change in the office. Plaintiff was not wearing makeup and had left her hair down with the intent of getting ready once she reached her destination.

17. The conductor of the 2104 Acela Express Train was Mr. Philip Harold (African American, male). When Mr. Harold approached Plaintiff to confirm her ticket, he began to have technological issues confirming Plaintiff and her sister's tickets.

18. At this point, Mr. Harold began to aggressively question Plaintiff as to whether she and her sister were paying customers. Plaintiff showed Mr. Harold her tickets on the Amtrak mobile application ("mobile app"), email confirmation of payment, and the ticketed status on her computer. Mr. Harold did not believe Plaintiff and asserted reasons as to why Plaintiff was being deceptive and lying about the documentation she provided.

19. Mr. Harold proceeded to angrily yell at Plaintiff, hit her computer screen as she tried to show him her documentation, and then threatened to "kick [Plaintiff] off the train," or words to that effect.

20. In an attempt to resolve the issue, Plaintiff contacted her employer's AMEX travel concierge, Andrea Mangino, for assistance in the hopes that she could confirm to Mr. Harold, as a third-party, that Plaintiff was indeed a paying customer.

21.     Ms. Mangino contacted Amtrak on Plaintiff's behalf and opened a ticket to investigate the matter further. She made Plaintiff aware that this may take additional time.  At the same time, Mr. Harold reiterated to Plaintiff that if she did not provide sufficient documentation by the next stop, he would "kick her off the train," or words similar to that effect.  When Plaintiff offered her phone to Mr. Harold so he could speak with Ms. Mangino himself, Mr. Harold refused stating that he "was not allowed to," or words similar.  Plaintiff then offered to provide information so that Mr. Harold could check directly with Amtrak as opposed to speaking to a third party. Once again he stated he "was not allowed to do that," or words similar to that effect.

22.     After a period of time, Mr. Harold hit his hand on Plaintiff's seat and yelled at her to grab her things because he was kicking Plaintiff and her sister off of the train by Amtrak Police, or words similar.  At this time, Officer S. Murphy (Badge #364) became involved in the incident.

23.     Officer Murphy approached Plaintiff and Mr. Harold and watched as Mr. Harold berated, degraded, and humiliated Plaintiff.  After a few minutes, Officer Murphy asked what the problem was and when Plaintiff began to answer, he stated that he was "not talking to [her]," or words similar.

24.     Officer Murphy proceeded to ask Plaintiff what her name was and when she responded, he asked Plaintiff to repeat her last name.  After giving Officer Murphy her last name again, Officer Murphy began to refer to Plaintiff and her sister as "Martinez" from then on with no courtesy of title.

25.     After Mr. Harold finished explaining the situation from his perspective, Plaintiff asked Officer Murphy if she could give her point of view, but Officer Murphy refused.  Officer

Murphy then walked away with Mr. Harold and when Plaintiff attempted to follow, Officer Murphy told her to "shut up and sit down," or words similar to that effect.

26. Plaintiff was forced to watch Officer Murphy and Mr. Harold converse about her and without her until Officer Murphy retrieved Plaintiff and escorted her to a gap space between the train cars.

27. At this point, Plaintiff found herself boxed in between the train doors, Officer Murphy directly in front of her, and Mr. Harold to her right. Plaintiff is a young, petite woman and became uncomfortable with being placed between two men with authority who were larger and stronger than her.

28. Plaintiff attempted to tell Officer Murphy what happened, but Mr. Harold rudely cut Plaintiff off and told her that her problem was that she "talked too much" and that he was the one "asking questions," or words similar to that effect.

29. Plaintiff answered all of the questions addressed to her and once again offered her phone to Officer Murphy and Mr. Harold, so that they could speak with Ms. Mangino—who she was still on the phone with—to resolve the issue. Mr. Harold threw Plaintiff's phone at her stating that he did "not want to speak to [Ms. Mangino]" and that if Plaintiff continued, he would have Plaintiff arrested by the police, or words similar to that effect. Officer Murphy confirmed that he would arrest Plaintiff.

30. Plaintiff's sister became worried for Plaintiff and approached the gap space. Plaintiff's sister began to cry and ask Mr. Harold to please listen to her because everything was just a misunderstanding and that she was uncomfortable with how the situation was being handled. Mr. Harold mocked Plaintiff's sister and stated "Oh yeah? Well I feel uncomfortable too then," or words similar. Mr. Harold then told Plaintiff's sister to sit down. Officer Murphy

also told Plaintiff's sister to "stop yelling" and to go sit down, or words similar. When Plaintiff's sister returned to her seat, a group of passengers expressed sympathy and attempted to calm her down because she was visibly shaken.

31. After Plaintiff's sister left the gap space, Plaintiff attempted to explain to Officer Murphy that his threat to arrest her was unwarranted because she was only trying to explain the situation. Officer Murphy responded by saying that "it is not a threat. I will arrest you," or words similar to that effect.

32. At this time, Mr. Harold told Plaintiff that to avoid arrest, Plaintiff must purchase another ticket. Plaintiff agreed and asked to return to her seat to retrieve her laptop and place a ticket order via AMEX per her employer's policy. Officer Murphy refused Plaintiff's request, stating that if she could not afford a ticket, Plaintiff would be thrown off or arrested. Plaintiff then requested to be able to retrieve her credit card to make the purchase and was told to "come back quick," or words similar to that effect.

33. When Plaintiff returned to the gap space with her card, Mr. Harold made the purchase. Plaintiff proceeded to request a confirmation number for her records, but Mr. Harold countered that the purchase would "show on [her] statement," or words similar to that effect.

34. Once the payment went through, Plaintiff expressed to Officer Murphy that she was disappointed with how he handled the situation to which he responded that it was "because [Plaintiff] would not shut up," or words similar to that effect. Plaintiff stated that she wanted an official report to be written up. When she asked for his name, he responded that his name was "Officer" and that is all Plaintiff needed to know, or words similar to that effect.

35. At this time, Plaintiff saw his name on his badge and took a picture of it. Plaintiff also took a photo of Mr. Harold. Officer Murphy then told Plaintiff to put her phone away.

36. Plaintiff also asked Mr. Murphy for his badge number. Officer Murphy was reluctant to give his badge number until Plaintiff stated that she would call 911 to make sure the situation was documented for her to follow up on. Officer Murphy then gave Plaintiff his badge number, but never gave his full name.

37. Plaintiff then asked Officer Murphy for the case number from his report, but he stated that that was not possible. Officer Murphy took out his phone and started typing at which point, Plaintiff reiterated her request for a case number to which he responded that his connection was spotty. When Officer Murphy finally provided one, it was about three numbers and when Plaintiff found this odd, Officer Murphy responded with a longer number and again stated that he had bad reception. Plaintiff was forced to ask for the number to be repeated multiple times because Officer Murphy was unintelligible.

38. Plaintiff returned to her seat and began to cry under the stress of what had just occurred. A few women attempted to comfort Plaintiff when Officer Murphy returned. Officer Murphy proceeded to ask Plaintiff if she had identification.

39. Plaintiff was surprised at the way in which Officer Murphy requested her license because he did not ask if he could have her license or if she had her license with her, but if she had identification at all. Plaintiff further questioned how Officer Murphy could have written a police report without any of her information.

40. Once Plaintiff gave Officer Murphy her license, he began to read her information out loud. When Plaintiff asked him not to read her personal information out loud for fear other passengers on the train, could hear, Officer Murphy ignored her request and continued to read the information aloud.

41. Upon arriving in New York City, Plaintiff contacted her boss and told him that she had experienced issues on Amtrak and was not feeling well enough to work. Plaintiff and her sister intended to go to the police station and report the incident, but once both reached the hotel they fell ill from the mental stress of the altercation. Plaintiff began to throw up repeatedly and could not stop crying. Plaintiff was forced to take time off work for her mental health.

42. Ms. Mangino followed up with Plaintiff and expressed regret at the situation. Ms. Mangino told Plaintiff that she had talked to Amtrak and was referred to their PR.

43. Plaintiff also emailed Amtrak's Police Department and requested the incident report number. Plaintiff was told that she would receive the report within ten (10) days but was forced to follow up several times for any response.

44. Once Plaintiff received the report, she realized that there were many inconsistencies and falsehoods. The whole description of the incident was about a paragraph and when Plaintiff asked to incorporate her statement into the report, she was told that the report could not be changed.

45. Plaintiff requested someone to contact about the matter of including her version of events into the report and was simply told to "call a supervisor," or words to that effect. Plaintiff was finally told to speak to the Chief of Police but was forced to leave a message. When the Chief returned Plaintiff's call, she was told to go to a Pennsylvania Police Department to submit a claim. Due to Plaintiff's employment obligations and residence in the Washington, D.C, she asked if she would be able to report the incident in Washington, D.C.

46. Plaintiff continued to speak with Ms. Mangino who informed Plaintiff that she had attempted to communicate with Mr. Harold and Officer Murphy over the phone, but that they were unwilling to communicate with her. Further, Ms. Mangino informed Plaintiff that

because the payment for both tickets had gone through despite Mr. Harold and Officer Murphy's objections that she did not pay for a ticket, Amtrak would refund Plaintiff the money for the ticket she was intimidated into purchasing while speaking with Mr. Harold and Officer Murphy.

47. Both Ms. Mangino and Plaintiff made attempts to resolve the issue but were met with obstacles and silence from Amtrak.

48. After a year of attempting to resolve the incident, on or about April 5, 2020, Plaintiff received a call from Amtrak Police Chief Ludwig who stated that the department had been backlogged and that he wanted to follow up on her report as he was required to close the case soon. Chief Ludwig requested that Plaintiff travel to Delaware to give an in-person statement, but due to the COVID-19 pandemic Plaintiff expressed hesitancy. Chief Ludwig stated that he understood and would check back in with Plaintiff as to other available options. Eventually, it was determined that Plaintiff would be able to provide a written statement.

49. On or about May 5, 2020, Plaintiff provided her written statement to Chief Ludwig. To date, Plaintiff has never heard back from Chief Ludwig.

50. Based on reason and belief, Plaintiff was discriminated against when she was accused of not purchasing a valid Acela ticket and was forced to buy another to prevent being kicked off the train or arrested.

51. As a result of this harassment and discrimination, Plaintiff has been gravely impacted with regards to her employment and emotional distress.

## COUNT I

### VIOLATION OF SECTION 1981

52. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

53. As a Latina, Plaintiff is a member of a protected class.

54. Because of her national origin (Latin America), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

55. Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's contract with Defendant that was made when she purchased her Acela ticket.

56. Defendant knew that Plaintiff is a Latina prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her national origin.

57. Plaintiff has been treated differently and subjected to different terms and conditions of her contract with Defendant due to her national origin (Latin America).

58. Defendant has limited, segregated, and classified Plaintiff in a way that deprived him of privacy and enjoyment of her Acela ticket, because of her national origin (Latin America).

59. Other passengers who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of the contract made when purchasing an Amtrak ticket.

60. Plaintiff's national origin was a determining factor in Defendant's unlawful conduct toward Plaintiff.

61. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

62. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her national origin (Latin America).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ms. Isabella Martinez, respectfully prays that this Court grant her the following relief:

a. Enter a declaratory judgment finding that the foregoing actions of Defendant violated Section 1981;

b. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c. Award compensatory damages in the amount of $750,000 that would fully compensate Plaintiff for the economic loss, lost wages, lost job benefits, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: October 25, 2021

                                      Respectfully submitted,

                                      */s/ Dionna Maria Lewis*

                                      Dionna Maria Lewis, Esq.
                                      District Legal Group, PLLC
                                      Bar No. 219016
                                      700 Pennsylvania Ave, SE, Suite 2098
                                      Washington, D.C. 20003
                                      Phone: (202) 486-3478
                                      Dionna@DistrictLegalGroup.com
                                      *Counsel for Plaintiff*